

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 04 C 5429 | **DATE** | 12/16/2004 |
| **CASE TITLE** | Greater Chicago Combine and Center, Inc., vs. The City of Chicago | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Defendant City of Chicago's Motion for Summary Judgment is GRANTED and Plaintiff Greater Chicago Combined and Center's Motion for a Preliminary Injunction is DENIED AS MOOT.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | DEC 1 7 2004 | |
| | Notified counsel by telephone. | date docketed | |
| ✓ | Docketing to mail notices. | | 33 |
| ✓ | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| WAP | courtroom deputy's initials | date mailed notice | |
| | | mailing deputy initials | |

U.S. DISTRICT COURT

2004 DEC 16 PM 4:31

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT **FILED**
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DEC 1 6 2004

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

GREATER CHICAGO COMBINE AND
CENTER, INC.,

                Plaintiff,

     v.

THE CITY OF CHICAGO,

                Defendant.

Case No. 04 C 5429

Hon. Harry D. Leinenweber

DOCKETED
DEC 1 7 2004

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff Greater Chicago Combine and Center, Inc.'s (hereinafter, "Chicago Combine") Motion for Preliminary Injunction, and the Defendant City of Chicago's (hereinafter, "City") Motion for Summary Judgment. For the following reasons, the City's Motion for Summary Judgment is granted and the Chicago Combine's Motion for Preliminary Injunction is denied as moot.

### I.  BACKGROUND

This case arises out of Chicago Municipal Ordinance § 7-12-387 (the "Ordinance"), which makes it unlawful to "import, sell, own, keep or otherwise possess any live pigeon" in any residential district within the City of Chicago. According to the City, for several years, Chicago residents have complained of the noise, smell, feathers and droppings generated by pigeons kept in coops within residential areas. In addition, city aldermen have been

concerned about the potential adverse health effects associated with pigeons, including a serious disease called histoplasmosis that can be caused by fungus spores in accumulated pigeon droppings.

In particular, Alderman Thomas R. Allen claims that he received complaints from several residents of the City of Chicago's 38th Ward pertaining to pigeons kept by neighbors. After receiving the complaints, he and members of his staff visited several residences in the 38th Ward and observed coops with at least a dozen or more pigeons. He was also purportedly informed that some coops contained nearly 100 pigeons. Alderman Allen claims to have subsequently researched (and discovered) the potential adverse health effects associated with pigeons, and states that a women from River Grove, Illinois informed him that her son had nearly died of an infectious disease potentially associated with a neighbor's keeping of pigeons.

Concerned about the nuisance and health effects of pigeons, Alderman Allen drafted an ordinance that was initially introduced to the City Council on January 16, 2003. After a hearing before the Committee on Health, the proposed ordinance was formally presented to, and passed by, the City Council on September 4, 2003. The affirmative vote was 48 to 0. The Ordinance was subsequently amended on May 19, 2004 to close a potential loophole pertaining to exemptions for the possession of pigeons for educational or

zoological purposes. This May 19, 2004 amendment also contained a subsection that exempted the prohibition of pigeons in two wards. This exemption was subsequently rescinded on November 3, 2004. See Def. Reply Br. at 4, n.4.

Plaintiff Greater Chicago is an Illinois not-for-profit corporation, whose members breed, raise, and train pedigreed, registered, and vaccinated homing pigeons for educational purposes. Greater Chicago argues that the Ordinance exceeds the City's home rule and police power authority, as well as the federal constitutional provisions of equal protection and substantive due process. Greater Chicago initially moved for a preliminary injunction. The City, however, agreed to withhold enforcement of the Ordinance until December 31, 2004, pending resolution of these claims. The City then filed a motion for summary judgment, which is presently before the Court, and, as shown below, effectively moots Greater Chicago's motion for a preliminary injunction.

## II. **LEGAL STANDARD**

### A. **Summary Judgment.**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is "material" if it could affect the outcome of the suit under the

governing law; a dispute is "genuine" where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The burden is initially upon the movant to demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In assessing the movant's claim, the court must view all the evidence and any reasonable inferences that may be drawn from that evidence in the light most favorable to the nonmovant. See Miller v. Am. Family Mut. Ins. Co., 203 F.3d 997, 1003 (7th Cir. 2000). Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations" contained in its pleading, but rather "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); Becker v. Tenenbaum-Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir. 1990); Schroeder v. Lufthansa German Airlines, 875 F.2d 613, 620 (7th Cir. 1989). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

### III. DISCUSSION

#### A. The City's Violation of Local Rule 56.1.

As an initial matter, Greater Chicago complains strenuously that Greater Chicago's Local Rule 56.1 Statement is inadequate

because the City relies on unsworn statements, rather than sworn affidavits. See Def. Resp. Mem. at 4. The City, in turn, points out that 28 U.S.C. § 1746 provides that unsworn declarations under the penalty of perjury carry the same effect as affidavits. The City is correct: 28 U.S.C. § 1746 permits unsworn declarations to be considered as "affidavits" for the purpose of Local Rule 56.1. See Woods v. City of Chicago, 234 F.3d 979, 987 (7th Cir. 2000). (The City also notes that Greater Chicago itself violated Local Rule 56.1 by simply disagreeing with the majority of the City's facts, rather than controverting them with specific evidence. Because, as shown below, Rule 56.1 facts play a very small role in rational-basis review, the Court need not concern itself further with the procedural details of each party's Rule 56.1 statement.)

Greater Chicago also complains that much of the City's Rule 56.1 Statement should be stricken or disregarded because it is replete with "opinions, unsupported allegations, conjecture, and hearsay declarations." Def. Resp. Mem. at 3. Greater Chicago is correct; many of the "facts" in the City's Rule 56.1 Statement are either conclusory or inadmissible hearsay that cannot be considered support for a motion for summary judgment. However, as shown below, the governing standard of review for the constitutional challenges here does not require that the Court uncover the <u>actual</u> bases underlying the City's passage of the Ordinance. See Heller v. Doe, 509 U.S. 312, 319-20 (1993); FCC v. Beach

- 5 -

Communications, Inc., 508 U.S. 307, 315-16 (1993). Rather, rational-basis review is sufficient if any conceivable reason justifies the Ordinance, irrespective of whether the City Council actually considered it. See id. Thus, the accuracy or truth of most of the statements in the City's Rule 56.1 Statement, as well as the supporting declarations, is not at issue here. See id. As a side note, Alderman Allen can certainly testify competently to receiving notice from residents and his own subjective beliefs regarding the nuisance and adverse health effects of pigeons in residential areas.

For purposes of summary judgment, all the City must show is that there is at least one conceivable rational basis for the Ordinance. See id. Given that any conceivable basis can uphold the Ordinance, it is difficult to pinpoint precisely what factual showing, if any, the City needs to make. But, in any event, Alderman Allen's admissible testimony, based on his own personal knowledge and subjective belief regarding the nuisance and health effects of pigeons, is sufficient to trigger Greater Chicago's burden to show that there is no conceivable basis whatsoever for the Ordinance. See id. In this same vein, Greater Chicago's request for an evidentiary hearing is misplaced: there is no room for evidentiary fact-finding under rational-basis review. See id.; see also Nat'l Paint & Coatings Assoc. v. City of Chicago, 45 F.3d 1124, 1127 (7th Cir. 1994).

### B. Greater Chicago Has Standing to Bring This Action, But Its Claims Under the Illinois Constitution Are Not Viable.

Greater Chicago raises claims under both the federal and Illinois Constitution, as well as other challenges to the Ordinance. The general rule is that if a court can avoid ruling on federal constitutional issues, and resolve the matter on state law or other grounds, it should do so. See Triple G Landfills, Inc. v. Board of Com'rs of Fountain County, 977 F.2d 287, 291 (7th Cir. 1992). Thus, the Court will initially examine the City's argument that Greater Chicago lacks standing to bring the present action. The Court will then examine that challenges that Greater Chicago brings under the Illinois Constitution, namely, that the Ordinance exceeds the City's home rule and police powers.

1. Greater Chicago has standing to bring this action.

In its initial submission, the City argues that Greater Chicago does not have standing to bring its equal protection claim because it has an "intrinsic conflict" in attacking the two-ward exemption on equal protection grounds. See Def. Mem. at 8, n.2. Specifically, the City contends that the "solution" to Greater Chicago's equal protection claim is to rescind the two-ward exemption, which would "presumably disserve the putative interests of pigeon-keepers in the two exempted wards who may be members of plaintiff Chicago Combine." Id. This potential standing issue,

however, was resolved by the November 3, 2004 amendment that rescinded the two-ward exemption.

With this standing issue mooted, the City raises, just barely, another standing issue. In a single sentence that trails at the end of a footnote, the City states that Greater Chicago's equal protection claim based on disparate treatment among zoning districts is almost subject to an intrinsic conflict of interest, since the purported "disparity could be cured by prohibiting pigeon-owning in all districts." Def. Reply Mem. at 4, n. 5. There is good reason why the City raises this argument in only a half-hearted fashion: this is plainly not the type of conflict that precludes association standing. Instead, the type of intra-association conflict that precludes standing must be profound, such that the association's position in the litigation will necessarily result in an outcome that directly disadvantages some of its members. See, e.g., Retired Chicago Police Ass'n v. City of Chicago, 76 F.3d 856, 866 (7th Cir. 1996).

Here, the outcome that Greater Chicago seeks, which is the invalidation of the Ordinance across all districts, will certainly not cause disadvantage to some of its members. The City's argument depends on substituting its own favored alternative outcome – the banning of pigeons in all zoning districts – with the one that Greater Chicago seeks. Because intra-association conflict should be analyzed from the vantage point of what the association – not

its opponent – seeks in the litigation, there is no conflict that precludes standing here. Cf. id; see also Builders Assoc. v. City of Chicago, 170 F.R.D. 435, 439 (N.D. Ill. 1996). (Accordingly, the Court does not need to address Greater Chicago's additional argument that it has authorization from the association to conduct this litigation.)

### 2. The Ordinance does not violate the City's home rule powers.

Greater Chicago argues that the Ordinance violates the City's home rule power, which is derived from Article VII, Section 6(a) of the Illinois Constitution. The Illinois Constitution grants home rule units, such as the City of Chicago, broad powers to legislate to protect the health and welfare of their communities. See City of Burbank v. Czaja, 769 N.E. 2d 1045 (1st Dist. 2002). However, legislation that is arbitrary and unreasonable violates home rule authority. See id.

The City responds by citing to 510 ILCS 45/7, an Illinois statute that explicitly authorizes municipalities like Chicago to enact ordinances prohibiting the keeping of "racing, hobby, or show pigeons." 510 ILCS 45/7 (West 2004). Perhaps lacking a worthwhile response, Greater Chicago instead simply ignores the City's submission pertaining to this statute. This Court, however, cannot ignore it, and the statute disposes of Greater Chicago's claim. (Moreover, even if the Court were to consider Greater Chicago's

home rule argument, its finding below that the Ordinance is not arbitrary and unreasonable also nullifies this argument.)

### 3. The Ordinance does not violate the City's police power.

In its memorandum supporting its motion for a preliminary injunction, Greater Chicago argues that the Ordinance violates the City's "police power." See Pl. Mem. in Support of Mot. for Preliminary Injunction at 7-8. Greater Chicago appears to have abandoned this argument in response to the City's summary judgment motion (i.e., it does not appear in Greater Chicago's response brief). In any event, the City is correct in pointing out the analysis of whether the Ordinance violates the City's police power is identical to the rational-basis analysis under federal equal protection. See Village of Lake Villa v. Stokovich, 211 Ill.2d 106 (2004). Because the Court is unsure whether Greater Chicago continues to advance this particular argument, it will instead move on the equal protection issues that encapsulate whatever argument Greater Chicago advances here.

### C. The Ordinance Does Not Violate the Federal Constitution.

#### 1. The Ordinance Does Not Violate Equal Protection.

##### a. Standard of Review.

The parties disagree on the proper standard for review pertaining to Greater Chicago's equal protection claims. In its complaint and motion for a preliminary injunction, Greater Chicago

appears to have conceded that, because there is no suspect classification at issue here, rational basis review is the proper standard. See Pl. Mem. in Support of Mot. for Preliminary Injunction at 12-14. In its response to the City's motion for summary judgment, however, Greater Chicago has reconsidered this position, and now claims that something greater than rational basis review is required. Specifically, Greater Chicago argues that "[r]estrictions on land use are subject to heightened scrutiny" and the proper constitutional test is whether there is "a substantial relationship to the public health, safety, and welfare, or whether it is arbitrary, irrational, and capricious." Pl. Resp. Mem. at 5, citing Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 395 (1926).

Because this case is before this Court pursuant to federal question jurisdiction, federal law applies. The only federal case that Greater Chicago cites on this issue, the 1926 Supreme Court case of Village of Euclid, has been interpreted by the Seventh Circuit as promulgating a standard identical to rational-basis review. See, e.g., Pro-Eco, Inc. v. Bd. Of Comm., 57 F.3d 505, 514 (7th Cir. 1995), citing Village of Euclid v. Amber Realty Co., 272 U.S. 365, 395 (1926). The remaining authority cited by Greater Chicago is Illinois state law. See Pl. Resp. Mem. at 5-10. Not only is Illinois law not controlling here, but closer examination of these cases shows that the standard articulated in these cases

is not some form of "heightened scrutiny" that is inconsistent with rational basis review, despite the unfortunate use of the phrase "substantial relationship." Indeed, Illinois case law firmly establishes that the "arbitrary and unreasonable" standard cited by Greater Chicago is essentially review under substantive due process. See People ex rel. Klaeren v. Village of Lisle, 202 Ill.2d 164, 187 (Ill. 2002).

Even if Illinois land use case law applied a heightened standard of review, and such law was applicable here, the City convincingly shows that the Ordinance does not fall under the category of traditional "land use" ordinances. Rather than being codified in the Chicago Zoning Ordinance, the Ordinance is located in the chapter on Animal Care and Control. See Def. Reply Mem. at 14, Ex. E. In any event, the Seventh Circuit has spoken on this issue, and this Court does not have the authority or the inclination to craft a new standard of review for equal protection claims that purportedly address restrictions on land use. See, Pro-Eco, Inc., 57 F.3d at 514.

Thus, where there is no fundamental right at issue and no suspect class involved, which is clearly the case here, the proper inquiry is rational-basis review of the City's action. Specifically, the Ordinance is entitled to a strong presumption of validity and will withstand scrutiny if there is any conceivable

rational basis supporting the Ordinance.  See Heller, 509 U.S. at 319-20; Beach Communications, Inc., 508 U.S. at 315-16.

> b.  The distinction between zoning districts does not violate equal protection.

Greater Chicago advances two arguments in support of its equal protection claim.  Greater Chicago initially claims that the ordinance makes an arbitrary distinction between zoning classifications.  See Def. Resp. Br. at 11.  That is, similar-situated pigeon owners in business and commercial districts are treated more favorably than pigeon owners in residential districts. Furthermore, Greater Chicago claims that residences in business and commercial districts are of greater density, such as high rise apartments, and therefore, the health concerns regarding pigeons should be greatest in those districts, rather than in residential districts.  Thus, according to Greater Chicago, the Ordinance's exclusive targeting of residential districts is plainly irrational.

These arguments are unpersuasive on several levels.  First, taken to its logical conclusion, Greater Chicago's argument would mean that <u>any</u> limits imposed on residential districts, but not also on similar uses in commercial and business districts, would violate equal protection.  This, of course, is ludicrous because it would eviscerate the fundamental concept of zoning, which specifically places use limits based on the predominant character of particular zoning districts.  Put another way, it is entirely rational for the City to place limits based on whether a district is <u>predominantly</u>

residential, business or commercial, even though there may be some co-mingling of uses across districts. For instance, the City Council may have reasonably believed that nuisance and adverse health concerns are attenuated in areas with a predominant business or commercial nature, but warrant greater attention in a predominantly residential area.

Second, Greater Chicago's argument that the Ordinance is irrational because it does not ban pigeons in areas where high rise residences may be located is similarly unpersuasive. As an initial matter, the City has put forth evidence that health concerns were not the only concern behind the Ordinance: noise, feathers, smell, and, in general, neighborhood aesthetics were also stated concerns, or, at a minimum, are conceivable rational concerns. See Def. Mem. at 2. Thus, even if Greater Chicago had the better argument here – which it does not – and there are greater health concerns pertaining to pigeons in business and commercial districts, the rationality of the Ordinance does not depend solely on the rationality of the City's analysis of health concerns.

In addition, Greater Chicago's own submission claims the "residential properties located in B and C zones are generally high rises with little to no open land. . . ." Def. Resp. Mem. at 11 (emphasis added). This raises the obvious question of whether large numbers of pigeons can even be kept in high rise apartments with the same ease as in single-family residential neighborhoods.

Although rooftops and locations within apartments are a possibility, it is rationally conceivable – and hence legally defensible – that the City reasonably recognized that the bulk of owned pigeons are kept by homeowners in residential districts.

Taken together, it is clear that there is a conceivable rational basis for the City's distinction between residential and other districts. This is all that is necessary to uphold the ordinance. See Heller, 509 U.S. at 319-20; Beach Communications, Inc., 508 U.S. at 315-16.

### c. The distinction between pet owners does not violate equal protection.

Greater Chicago next argues that the ordinance improperly discriminates between pet owners because it does not prohibit other types of loud or disease-carrying pets, such as dogs or rats. See Def. Resp. Mem. at 11-12. The City responds by citing authority that indicates that a municipality is free to address one issue at a time, and need not attack all nuisance or health issues simultaneously. See Def. Reply Mem. at 5, citing Williamson v. Lee Optical of Oklahoma, Inc., 348 U.S. 483, 489 (1955).

Greater Chicago's argument here is borderline frivolous. Taken to its logical conclusion, this argument would hold that the City cannot restrict ownership of _any_ disease-carrying or nuisance-causing animal unless it similarly restricts ownership of _every_ such animal. This, of course, is not the law: a legislature is

free to make distinctions among animals and may determine which animals, or which animal breeds, warrant greater attention because of annoyance or danger. See, e.g., New York City Friends of Ferrets v. City of New York, 876 F. Supp. 529, 534-40 (S.D.N.Y. 1995)(noting that the Constitution does not guarantee ferret owners precisely equal regulatory status to other animal owners, such as pit bull owners); Vanater v. Village of South Point, 717 F. Supp. 1236 (S.D. Oh. 1989)(holding that in banning pit bull terriers, Village was not required to address all dangerous breeds of dog); Garcia v. Village of Tijeras, 765 P.2d 758 (1988)(same); Kerr v. Kimmell, 740 F. Supp. 1525 (D. Kan. 1990). The City Council here could have determined that pigeons, unlike other animals, are particularly prone to be kept in large numbers, thus increasing their nuisance and disease-carrying potential in residential neighborhoods. In addition, the City Council may have noted that pigeons are typically not recognized as traditional pets in residential neighborhoods, and thus their presence may be experienced, fairly or unfairly, by other residents as uniquely intrusive.

Greater Chicago strenuously argues that all these negative connotations pertaining to pigeons are flatly wrong. Homing pigeons - unlike the feral pigeons that so many city dwellers dislike - are neither uniquely noisy nor messy, nor particularly likely to carry diseases, according to Greater Chicago. All this

may be true - but it is an argument that, although repeatedly presented by Greater Chicago, has virtually no weight here. The controlling issue here is whether there is <u>any</u> conceivable rational basis for the City's action: the correctness (or incorrectness) of the City's bases for enacting the Ordinance is not the proper inquiry under rational-basis review. See Heller, 509 U.S. at 319-20; Beach Communications, Inc., 508 U.S. at 315-16. To hold otherwise would invite this Court to conduct its own fact-finding mission and substitute its judgment for that of the City, which it plainly cannot do. See id.

Taken together, the City's action here does not violate equal protection. The purported classifications that Greater Chicago complains of, namely, distinctions based on zoning district and type of pet ownership, are well within the bounds of rational decision-making. Accordingly, this Court cannot disturb the City's action on this basis.

**2. The Ordinance Does Not Violate Substantive Due Process.**

a. Standard of Review.

The parties also disagree on the contours and nature of review under substantive due process. In its initial brief, the City offers a slightly muddled argument as to why Greater Chicago has pled itself out of <u>any</u> form of substantive due process review. See Def. Mem. at 13-15. Specifically, the City appears to argue that because Greater Chicago has failed to allege a "fundamental

right" at stake, "'substantive due process' is completely out of the picture." Id. at 14-15; cf. Def. Reply Br. at 8-9. The City should not be faulted for some apparent initial confusion pertaining to the exact contours of a substantive due process analysis of property interest, as the Supreme Court and Seventh Circuit jurisprudence on this issue have not been models of clarity. See, e.g., New Burnham Prairie Homes, Inc. v. Village of Burnham, 910 F.2d 1474, 1481, n.5 (noting that "[i]t must be acknowledged frankly that the Supreme Court has yet to set the contours of any substantive due process right with respect to property interests"); cf. Nat'l Paint, 45 F.3d 1124, 1129 (stating that only laws that affect fundamental rights come within the purview of the substantive due process doctrine).

There are, however, two separate avenues for raising substantive due process claims. See Pro-Eco, Inc., 57 F.3d at 514; see generally Peter J. Rubin, Square Pegs and Rounds Holes: Substantive Due Process, Procedural Due Process, and the Bill of Rights, 103 Colum. L. Rev. 833, 841-46. The first avenue provides heightened scrutiny of government action that interferes with a "fundamental right," such as the right to marry, bodily integrity, and so forth. See id. When fundamental rights are not at stake, the second avenue provides rational-basis scrutiny of government action (i.e., government action that is arbitrary or unreasonable). See id.

Here, Greater Chicago effectively concedes that ownership of pigeons is not a "fundamental right." As a result, the only avenue of review available is whether the Ordinance is arbitrary or unreasonable, or, in Seventh Circuit terms, "invidious or irrational." Pro-Eco, 57 F.3d at 514. This is the same standard discussed above under the equal protection analysis. See id. The standard is highly deferential: government action is rational if there is any sound reason – real or hypothetical – for its action. See id. (As noted above, Greater Chicago's argument that land use is a right that deserves "heightened scrutiny" under constitutional review is incorrect.)

In the Seventh Circuit, there is an additional burden on the plaintiff claiming a substantive due process violation when only the deprivation of property is at stake: the plaintiff must also show that there has been a separate constitutional violation or the available state law remedies are inadequate. See, e.g., Lee v. City of Chicago, 330 F.3d 456, 467 (7th Cir. 2003); New Burnham, 910 F.2d at 1481. Here, Greater Chicago ignores these pleading requirements and does not address the issue of separate constitutional violations or inadequate state remedies in either its complaint or various motions and memoranda. This alone is sufficient to dismiss its substantive due process claim. See id. However, to avoid an inevitable amendment to the complaint and the unnecessary continuation of this litigation, the Court will assume

arguendo that Greater Chicago has in fact properly pled (and can show) that there is either a separate constitutional violation or inadequate state remedies. Accordingly, the Court will address the merits Greater Chicago's substantive due process claim.

      b.   The City's failure to distinguish between homing and feral pigeons is not irrational.

Greater Chicago raises a few additional arguments under a substantive due process theory to show that the Ordinance is arbitrary and irrational. First, Greater Chicago contends that the Ordinance "irrationally fails to recognize the distinction between the nuisances attributed to feral or pest pigeons and the pedigreed homing pigeon." Pl. Resp. Mem. at 13. Specifically, homing pigeons are to be distinguished from the "disgusting, filthy birds . . . loitering in parks and under El tracks, and swarming for food when an eccentric pigeon feeder brings out a loaf of bread." Id. at 15. Unlike their disreputable brethren, homing pigeons are pedigreed, vaccinated, registered and banded birds, equivalent to show quality dogs or thoroughbred horses, with a well-documented lineage. Id. at 4. As a result, homing pigeons are significantly less likely to carry diseases than feral pigeons. See id.

In support of this argument, Greater Chicago points to the State of New York's enlightened view, where homing pigeons are specifically excluded from the city's ban against the keeping livestock and other animals. See id. at 14, citing N.Y. Multiple Dwelling Law § 12. (It turns out, however, that the Illinois

courts do not look as favorably upon pedigreed pigeons. See City of Des Plaines v. Gacs, 65 Ill.App. 3d 44, 48 (1st Dist. 1978) (dismissing constitutional challenge to ban on fowl, including pedigreed racing pigeons, within city)). Greater Chicago's points distinguishing homing pigeons from feral pigeons are well-taken. Those who are uneducated about pigeons may be prone to making uninformed generalizations that group all types of pigeons together. Indeed, such generalizations may find their way into law.

Unfortunately, Greater Chicago's worthy distinctions are without legal significance. There are at least several reasons why the City's failure to distinguish between homing and feral pigeons withstands rational-basis scrutiny. First, the City points out that there would likely be significant enforcement difficulties with a ban on only feral pigeons, but not pedigreed pigeons. In terms of phenotype, there are no striking visual differences between a homing and a feral pigeon, at least to the lay-person. Although homing pigeons will likely be better groomed and be banded, this is not an inherent physical difference, as one might find between different species of an animal or even different breeds of dogs. Thus, a selective ban on, for instance, pit bull dogs is certainly more-easily enforced than a ban on birds that are more alike than disalike - although even distinguishing pit bulls from other dogs is not without significant difficulties. See Dog

Federation of Wisconsin, Inc. v. City of South Milwaukee, 504 N.W.2d 375, 378 (Ct. App. Wis. 1993)(upholding restrictions on "pit bulls" even though there was expert testimony showing great difficulty in identifying pit bulls).

Second, as noted above, the record indicates that the City's intended purpose behind the Ordinance was not solely health concerns, but also noise and other nuisance/aesthetic concerns. Greater Chicago does not show that homing pigeons are significantly quieter than feral pigeons, nor that the homing pigeons are less likely to be kept in large numbers in outdoor spaces that residential neighbors might find unsightly. These are all conceivable rational reasons for why the City did not selectively carve out homing pigeons from the Ordinance.

### c. The City's purported failure to appreciate the minimal health risks posed by pigeons is not irrational.

One of the purported reasons behind the Ordinance was the potential adverse health effects associated with pigeon and pigeon droppings. See generally Def. Mem. at 2-3. Specifically, the City notes that a serious disease called histoplasmosis, which is an infection caused by a fungus that can grow in soil that contains bird droppings, is associated with pigeons. See id. People with impaired immune systems, such as AIDS, leukemia, or even long-term smokers, may be a higher risk. See id. In support of the concern over histoplasmosis, the City notes Alderman Allen's declaration

that a woman from River Grove, Illinois reported to him that her child almost died from histoplasmosis. See Def. Rule 56.1 Statement ¶ 84. (Again, this statement is not inadmissible hearsay, as it goes to notice to Alderman Allen and addresses his good-faith belief that there are significant health concerns associated with pigeons in residential areas.)

Greater Chicago claims that the health risks pertaining to pigeons are virtually non-existent. See Pl. Resp. Mem. at 8-9. It notes that Dr. Joel McCullough, the medical director of environmental health for the Chicago Department of Public Health, was quoted as stating that pigeons "are not a public health hazard" in a recent Chicago Tribune article on a man who feeds pigeons in Lincoln Square. See id. Dr. McCullough also apparently stated that the fungus related to histoplasmosis had not been detected in the City as far back as anyone can remember. See id. Greater Chicago also includes the affidavit of Dr. Kevin Zollars, an expert in the health and care of pigeons, who states that "histoplasmosis is much more frequently attributed to bat feces than pigeon feces" and that "[s]oil must be enriched by contaminated feces for two years or more before histoplasmosis reaches a potentially significant level." Def. Resp. Mot, Ex. D. Dr. Zollars also opines that the "risk of a human being contracting histoplasmosis from any source is infinitesimally small." Id.

There is unmistakably a disputed factual issue about the severity of any potential health risk – and this alone entitles the City to judgment. See Nat'l Paint, 45 F.3d at 1127. Moreover, there is no dispute that pigeon droppings can pose significant health concerns. See City of Des Plaines, 65 Ill. App. 3d at 48 (noting the potential of health risks from pedigreed pigeons). Greater Chicago may indeed be correct in asserting that the risk is extremely low, or at least significantly lower than what the City Council believes. But it cannot – and does not – claim that there is no risk. See Def. Resp. Mot, Ex. D. This is not to say that an ordinance based exclusively on an "infinitesimally small" risk could not, in some circumstances, potentially be arbitrary or irrational. But, as noted above, the Ordinance also has rational nuisance concerns behind it. Thus, taken together, the City's potential overestimation of the health risks of pigeons is simply not sufficient to render the Ordinance unconstitutional.

> d. Greater Chicago is not entitled to
> less restrictive means nor can its members
> escape application of the Ordinance.

Greater Chicago also claims that there are less restrictive means through which the City can impose these regulations on pigeons. Specifically, Greater Chicago recommends sanitation and fire inspections, as well as the payment of permit or license fees. See Pl. Resp. Mem. at 17-18. Greater Chicago also argues that the implementation of such regulations would not be extraordinarily

burdensome to the City. See id. All of this may be true. But there is one significant problem with this argument: Greater Chicago fails to provide <u>any</u> authority that it is entitled to less-restrictive-means implementation of laws that fall under rational-basis review. And this Court fails to find any authority that would require narrow tailoring of this Ordinance. Thus, the City is under no legal obligation to accommodate Greater Chicago's request.

Greater Chicago's last-ditch argument is that even if the Ordinance is deemed constitutional, it should not apply to Greater Chicago members. See Pl. Resp. Mem. at 18-20. According to Greater Chicago, the Ordinance is a "zoning/land use issue" and the Chicago Zoning Ordinance allows formerly-allowed existing uses to continue forward as nonconforming uses. See id. In addition, Greater Chicago argues that certain members were issued building permits to construct lofted garages and sheds for pigeon keeping, and thus enforcement of the Ordinance is "a direct infringement on the rights of Plaintiff's members to use their land in a manner which was otherwise lawful until the ordinance took effect." Id. at 20.

As the City correctly points out, "legal non-conforming uses are creatures of the Chicago Zoning Ordinance" and apply only to uses that were previously allowed under the Zoning Ordinance. Def. Reply Mem. at 14-15. As noted above, the present Ordinance is not

codified under the Zoning Ordinance, and thus is not subject to the terms of legal non-conforming uses. Greater Chicago's argument pertaining to building permits is similarly unavailing because the present Ordinance does not implicate the Zoning Ordinance.

Finally, Greater Chicago raises an odd issue pertaining to the City's purported encouragement and reinforcement of Greater Chicago members' activities "through its exclusive invitation for GCC [Greater Chicago] members to participate in the 2001 official City of Chicago Holiday Tree Lighting ceremony." Id. Greater Chicago attaches an exhibit showing photographs of its members' pigeons being released at the tree lighting ceremony. See id., Ex. L. Greater Chicago mysteriously omits reference to any cognizable legal theory under which these facts take significance, and the Court, frankly, is at a loss in understanding the relevance of these facts. Is Greater Chicago implying some form of equitable estoppel, laches or waiver argument here? The best course, however, is to refrain from further speculation and simply pass on this particular issue.

## IV.  **CONCLUSION**

In summary, none of the arguments raised by Greater Chicago come  close to surmounting the highly deferential rational-basis review that applies to this Ordinance. The very structure of our Constitution, which based upon clearly delineated separation of powers, mandates that courts should only intrude on the legislative

process in extraordinary circumstances. See Beach Communications, Inc., 508 U.S. at 313-16. The Court is, of course, sympathetic to the potential hardships that this Ordinance may cause certain Greater Chicago members, and appreciates that losing one's pet, hobby, or perhaps business, is always unpleasant. But the Constitution mandates that Plaintiff's proper recourse is through the democratic process and political arena, not the courts. See id.

For the foregoing reasons, Defendant City of Chicago's Motion for Summary Judgment is **GRANTED** and Plaintiff Greater Chicago Combine and Center's Motion for a Preliminary Injunction is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Dated: _December 16, 2004_

- 27 -